IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

ENTERED

THE DATE OF ENTRY IS
ON THE COURT'S DOCKET
TAWANA C. MARSHALL, CLERK

| | |
|---|---|
| IN RE: LORI ANN CERVERA, § § § § § Debtor. § § § LORI ANN CERVERA, § § Plaintiff, § - against - § § § § FIRST STATE BANK, MESQUITE, § Defendant. § | CASE NO. 05-30911-bjh13 ADV. PRO. 05-03103-bjh |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before the Court is the Debtor's adversary Complaint to Invalidate the First State Bank of Mesquite's Lien on Debtor's Homestead and the bank's counterclaim for subrogation and the recovery of attorneys' fees (and other costs and expenses) to the extent the Court declares the bank's lien invalid. The Court has core jurisdiction over the adversary complaint in accordance with 28 U.S.C. §§ 1334 and 157. After hearing the evidence on January 11, 2006, and considering the arguments of counsel, the Court makes the following findings of fact:

1. The property located at 2033 Allegheny Drive, Mesquite, Texas (the "Allegheny Property"), was purchased by Frank Cervera ("Frank") and his then wife, Melanie Cervera ("Melanie"), on October 10, 1990. Title to the Allegheny Property was taken in both Frank's and Melanie's names. *See* Amended Pre-Trial Order (docket no. 26) ("PTO"), Stipulated Fact 1.

2. Frank and Melanie were apparently separated when the Allegheny Property was purchased, and Frank lived in the Allegheny Property.

3. The Debtor, Lori Ann Cervera ("Lori") moved into the Allegheny Property with Frank in the fall of 1991. *See* PTO, Stipulated Fact 2.

4. On June 17, 1992, Frank and Melanie were divorced. As part of the divorce, Frank was awarded title to the Allegheny Property as his separate property. PTO, Stipulated Fact 3; *see also* Exhibit A at 5. However, legal title to the Allegheny Property remained in Frank's and Melanie's names until May 2004.

5. Frank and Lori were married on November 7, 1992. PTO, Stipulated Fact 4. Frank and Lori continued to live in the Allegheny Property together for another 8 years or so.

6. Frank's business, Ace Auto Rentals ("Ace"), was in financial trouble by early 2000. Lori worked for Ace as its bookkeeper. The Cervera family's livelihood was dependent upon the financial success of Ace.

7. Ace's primary lender was First State Bank of Mesquite ("Mesquite Bank"). During the 1990s, Frank and Ace enjoyed a very good relationship with Mesquite Bank. Frank golfed with several of the bank's officers, and they socialized with each other's families. Several of the bank's officers were at functions at the Allegheny Property, including dinner parties and birthday parties. However, when Ace began experiencing financial difficulties, the business relationship with Mesquite Bank became less cordial.

8. Frank and Lori separated in January, 2001. PTO, Stipulated Fact 6. Frank moved out of the Allegheny Property and into an apartment at that time. Shortly thereafter, Frank rented a house at 2000 Blackfoot Trail, Mesquite, Texas (the "Blackfoot Property").

9. Frank decided that he wanted to purchase the Blackfoot Property for his home. Because

**Findings of Fact and Conclusions of Law**            **Page 2**

Frank and Lori were still married, they both signed a loan application to finance the purchase of the Blackfoot Property. Exhibit K. Lori and Frank closed on the purchase of the Blackfoot Property on May 1, 2001. Exhibit L.

10. Lori and Frank signed false certifications on the loan application and various of the closing documents—falsely certifying that they had listed all of their assets and liabilities on the loan application, *see* Exhibit K, and falsely certifying that Lori would occupy the Blackfoot Property as her principal residence. Exhibit M.

11. Although title to the Blackfoot Property was taken in both Frank's and Lori's names, Lori never lived in the Blackfoot Property. Frank lived in the Blackfoot Property, while Lori continued to live in the Allegheny Property with the couple's minor son.

12. On April 8, 2003, Frank, who was still legally married to Lori, filed an application for residential homestead exemption with the Dallas County Appraisal District, thereby designating the Blackfoot Property as his homestead. PTO, Stipulated Fact 8; *see also* Exhibit 4D.

13. On July 3, 2003, Frank borrowed $192,180.00 from Mesquite Bank and secured the debt with a deed of trust lien on the Allegheny Property (the "2003 Loan and Lien"). PTO, Stipulated Fact 9; *see also* Exhibits 5E and N. According to the bank's loan document, the purpose of the 2003 Loan was to enable Mesquite Bank to "Recover Charged off note." Exhibit N.

14. Frank testified that he did not tell Lori about the 2003 Loan and Lien. Lori similarly testified that she was unaware of the 2003 Loan and Lien when it was originally made. The Executive Vice-President of Mesquite Bank, Mariano Hernendez ("Mariano"), testified, however, that the bank was unwilling to loan money against the Allegheny Property when

the bank discovered that record title to the property still remained in Frank's and Melanie's names. Mariano further testified that Frank assured the bank that he had been awarded title to the Allegheny Property as his separate property when Melanie and he divorced in 1992. According to Mariano, Frank then called Lori, who brought the divorce decree to the bank so that Frank could demonstrate his ownership of the Allegheny Property to the bank. Lori disputes that she came to the bank to deliver the divorce decree; rather, she testified that Frank called her and she faxed the divorce decree to the bank.

15. Regardless of which version of the facts is accurate–*i.e.*, Lori brought the divorce decree to the bank personally or she faxed it to the bank, the Cerveras' testimony that Lori did not know about the 2003 Loan and Lien is not credible. To believe their testimony, this Court would have to conclude that Lori was not interested in why Frank needed to prove to Mesquite Bank that he owned the Allegheny Property as his separate property in July 2003. Because she was separated from Frank and living in the Allegheny Property with their minor son at that time, surely she would have asked what he was doing at the bank and why he needed to convince the bank that he had title to her house. Accordingly, the Court disbelieves the Cerveras' testimony and finds that Lori knew about the 2003 Loan and Lien.

16. Bank of America held the purchase money mortgage debt on the Allegheny Property, secured by a first lien on the Allegheny Property. Accordingly, the 2003 Lien was a second lien on the Allegheny Property.

17. Lori never signed the documents that evidenced the 2003 Loan and Lien. Exhibits 5E and N.

18. In September 2003, Mesquite Bank paid off the $18,000.00[1] debt owed to Bank of America, who was threatening to foreclose on the Allegheny Property. Upon the payment of the Bank of America debt, the 2003 Lien became the first lien on the Allegheny Property.

19. Lori and Frank were divorced by a final decree of divorce dated May 7, 2004. Exhibit 1. Under the divorce decree, Lori was awarded title to the Allegheny Property as her sole and separate property, and Frank was awarded title to the Blackfoot Property, two lots in Mesquite, and the Lake Limestone Lot as his sole and separate property. PTO, Stipulated Fact 10; *see also* Exhibit 1 at 19-21. Finally, under the divorce decree, Frank agreed to pay "[a]ny and all debts . . . incurred solely by [him] from and after October 15, 2000," including the 2003 Loan. Exhibit 1 at 21-22.

20. Although Frank was awarded the Allegheny Property as his separate property when he divorced Melanie in June 1992, Exhibit A at 5, legal title to the Allegheny Property remained in Frank's and Melanie's names until Frank deeded the property to Lori in May 2004 after their divorce. Exhibit 9I.

21. Frank's business, Ace, was still struggling financially. Frank wanted to try to get his business back on track financially. Mesquite Bank was unwilling to extend further credit to either Frank or Ace in light of the amounts then outstanding to the bank and Frank's prior charged off debts to the bank. However, Frank testified that he and Mesquite Bank came up with a game plan. According to Frank, they decided that Lori should assume the 2003 Loan and then take out a new loan (also to be secured by the Allegheny Property) to repay the 2003

---

[1] The $18,000.00 figure represents an approximation of the debt owed to Bank of America. The parties failed to put on any evidence that established the exact amount of the debt owed by the Cerveras to Bank of America. Accordingly, for the purposes of this decision, the Court finds the $18,000.00 figure testified to at trial to be the correct amount of the indebtedness owed by the Cerveras to Bank of America at the time Mesquite Bank paid that debt.

**Findings of Fact and Conclusions of Law**

Loan. Then, once the 2003 Loan was repaid, Mesquite Bank would be in a position to consider further extensions of credit to Frank and/or Ace. Significantly, while Mariano testified at trial, he did not dispute Frank's testimony in this regard. Accordingly, the Court finds Frank's testimony to accurately reflect what happened.

22. As found previously, Lori worked for Ace, and her family's financial well-being was dependent on Ace's financial well-being. Although this deal made no financial sense for her otherwise, Lori agreed to (i) assume the 2003 Loan, (ii) "borrow" $150,000.00 from Mesquite Bank and pledge the Allegheny Property to secure her "new" debt, and (iii) pay the proceeds of her "new" loan to Mesquite Bank to retire the 2003 Loan. Lori agreed to do this because she was anxious to help insure Ace's financial ability to continue in operation, which would insure, she thought, her financial well-being. Accordingly, Lori signed an assumption agreement, Exhibit 6F, a note payable to Mesquite Bank in the principal amount of $150,000, Exhibit 8H, and a Deed of Trust on the Allegheny Property, Exhibit 11, in favor of Mesquite Bank (the "2004 Loan and Lien"). In addition, Lori signed an affidavit in which she swore that "during the marriage [to Frank] and up to the date of May 7, 2004, . . . the [Allegheny Property] did not, nor did it ever, constitute the . . . residential homestead of this Affiant. That in fact the homestead of this Affiant was [the Blackfoot Property]." Exhibit 7G. This was a false affidavit, as both Lori and Mesquite Bank knew at the time the affidavit was signed.

23. The 2004 Loan and Lien transaction closed on May 27, 2004, Exhibit 10J, and the proceeds of the 2004 Loan were used to pay (i) the outstanding balance on the 2003 Loan ($144,015.44), (ii) 2003 real property taxes owing on the Allegheny Property ($3,699.56), and (iii) associated closing costs ($2,285.00). *Id.* Lori received no proceeds from the 2004

Loan at closing.

24. Lori did not have the financial ability to make the payments required by the 2004 Loan. Mesquite Bank was aware of the fact that Lori did not have the financial ability to make the payments required by the 2004 Loan when the transaction was first concocted by Frank and the bank. Frank had a side agreement with Lori that he would make the loan payments for her, of which the bank was aware. And, in fact, Frank made several payments on the 2004 Loan for Lori.

25. As Mariano admitted, Mesquite Bank wanted to enter into the 2004 Loan and Lien transaction with Lori to get Frank's old debt paid; the bank would never have extended the 2004 Loan to Lori other than to pay off Frank's old debt.

26. At the time of the 2004 Loan, the Allegheny Property was worth approximately $116,870.00. Exhibit 2B.

27. On January 10, 2005, Mesquite Bank sent Lori a letter informing her that the bank would proceed with foreclosure on the Allegheny Property due to her failure to make the payments on the 2004 Loan. PTO, Stipulated Fact 13.

28. On January 26, 2005, Lori filed Chapter 13 to stop Mesquite Bank's foreclosure on the Allegheny Property. PTO, Stipulated Fact 12 [sic].[2]

29. Lori has lived continuously in the Allegheny Property since 1991. PTO, Stipulated Fact 5.

Based on the forgoing findings of fact, the Court makes the following conclusions of law:

---

[2] This Stipulated Fact should actually appear as Stipulated Fact 14 in the Amended Pre-Ttrial Order; however, due to a numbering error by the parties, this information is contained in the second Stipulated Fact labeled as Stipulated Fact 12 in the Amended Pre-Trial Order.

**Findings of Fact and Conclusions of Law** Page 7

1.  Frank's attempt to designate the Blackfoot Property as his homestead did not result in the Cerveras' abandonment of the Allegheny Property as their marital homestead. This is so for at least two reasons.

    a.  First, under article 16, § 50(b) of the Texas Constitution, "[a]n owner or claimant of the property claimed as homestead may not sell or abandon the homestead without the consent of each owner and the spouse of each owner, given in such manner as may be prescribed by law." Here, Frank, as the owner of the Allegheny Property, and Lori, as his spouse, claimed the Allegheny Property as their marital homestead from at least 1992 through 2001. While Frank applied for a residential homestead exemption on the Blackfoot Property on April 3, 2003, Exhibit 4D, Frank's attempt to abandon the Allegheny Property as his homestead was ineffective under the Texas Constitution due to Lori's failure to consent. Tex. Const. art. 16, § 50(b). Because a married couple in Texas may only have one marital homestead, *Crowder v. Union Nat'l Bank of Houston* 261 S.W. 375, 377 (Tex. 1924), *Floyd v. Rice*, 444 S.W.2d 834, 836 (Tex. Civ. App. 1969), *Bell v. Franklin*, 230 S.W. 181, 184 (Tex. Civ. App. 1921) (noting that "[t]here can be but one homestead, and until a new homestead is acquired there can be no abandonment of the old by the act of the husband alone"), the Allegheny Property remained the marital homestead of Frank and Lori Cervera.

    b.  Second, § 41.004 of the Texas Property Code compels this same conclusion. Section 41.004 provides that "[i]f a homestead claimant is married, a homestead cannot be abandoned without the consent of the claimant's spouse." Tex. Prop. Code Ann. § 41.004 (2000). Accordingly, Frank could not abandon the Allegheny Property as the

Cerveras' marital homestead without Lori's consent, which she did not give. Lori has continuously lived in the Allegheny Property since 1991, and she has not consented to any abandonment of the Allegheny Property as the homestead.

    c.    In coming to this conclusion, the Court rejects Mesquite Bank's reliance on certain Texas court decisions from the 1930s that held that the husband, as the head of the household, could make the homestead designation for the marital couple. While those decisions are accurately cited by the bank, they have been effectively overruled by the amendments to the Texas Constitution and the Texas Property Code cited above.

2.    Because the Allegheny Property was the marital homestead of Lori and Frank Cervera in 2003, the 2003 Lien is not valid against the Allegheny Property.

    a.    Article 16, § 50(c) of the Texas Constitution provides, in part, that

> [n]o mortgage, trust deed, or other lien on the homestead shall ever be valid unless it secures a debt described by this section, whether such mortgage, trust deed, or other lien shall have been created by the owner alone, or together with his or her spouse, in case the owner is married.

Similarly, § 41.001(b) of the Texas Property Code defines the types of encumbrances that "may be properly fixed on homestead property."

    b.    It is undisputed that the 2003 Loan is not a debt authorized to be placed on a homestead under either the Texas Constitution, *see* Tex. Const. art. 16, § 50(a), or the Texas Property Code. *See* Tex. Prop. Code. Ann. § 41.001(b).

    c.    Accordingly, the 2003 Lien is void as against the Allegheny Property.

3. Because the 2003 Lien is not a valid lien against the Allegheny Property, the 2004 Loan, which refinanced the 2003 Loan, is not a valid debt against the Allegheny Property, which remained Lori's homestead.

   a. As noted previously, article 16, § 50(c) of the Texas Constitution provides, in part, that "[n]o mortgage, trust deed, or other lien on the homestead shall ever be valid unless it secures a debt described by this section." And, as noted previously, § 41.001(b) of the Texas Property Code defines the types of encumbrances that "may be properly fixed on homestead property." The 2004 Loan is not "a debt described by" article 16, § 50(c) of the Texas Constitution. Moreover, the 2004 Lien is not a type of encumbrance that § 41.001(b) of the Texas Property Code allows to be placed on a homestead.

   b. On May 26, 2004, the Allegheny Property constituted the homestead of Lori as a single adult person. While Mesquite Bank contends that the 2004 Loan is a valid debt against the Allegheny Property because it was the refinance of a lien against a homestead, Tex. Const. art. 16, § 50(a)(4), Tex. Prop. Code Ann. § 41.001(b)(5), for that contention to be legally correct, the 2003 Lien would have to be a valid lien against the Allegheny Property, as counsel for Mesquite Bank admitted during closing argument. Because this Court has concluded that the 2003 Lien is not a valid lien, the 2004 Loan is not an authorized debt against the Allegheny Property in accordance with article 16, § 50(a)(4) of the Texas Constitution, and the 2004 Lien is not an authorized encumbrance in accordance with § 41.001(b)(5) of the Texas Property Code.

    c.    Accordingly, the 2004 Lien is void as against the Allegheny Property.

4.    Mesquite Bank is not a lender for value without actual knowledge that is entitled to conclusively rely on Lori's affidavit designating the Blackfoot Property as her homestead.

    a.    Article 16, § 50(d) of the Texas Constitution provides that "[a] purchaser or lender for value without actual knowledge may conclusively rely on an affidavit that designates other property as the homestead of the affiant and that states that the property to be conveyed or encumbered is not the homestead of the afffiant."

    b.    While Lori signed such an affidavit in connection with the 2004 Loan, Exhibit 7G, Mesquite Bank had actual knowledge that the affidavit was false. Mesquite Bank knew that Frank and Lori claimed the Allegheny Property as their marital homestead at least through 2001. Mariano testified that the bank checked the appraisal district records when making the 2003 Loan. *See* Exhibit 2B. So, the bank was aware that the Allegheny Property had been claimed as homestead by Frank and Lori through at least 2001. Moreover, Mariano and other bank officers had been to the Allegheny Property when Frank and Lori lived there as husband and wife. At a minimum, Mesquite Bank knew that Lori's statement in the affidavit that the Allegheny Property had never been her residential homestead was false. Moreover, the bank knew that the Blackfoot Property could not have been Lori's residential homestead "during the marriage and up to . . . May 7, 2004," because Frank and Lori did not purchase the Blackfoot Property until May 1, 2001.

    c.    While Lori should not have signed a false affidavit, Mesquite Bank cannot rely on that false affidavit, because it had actual knowledge of its falsity.

**Findings of Fact and Conclusions of Law**                              **Page 11**

5. Mesquite Bank is entitled to be subrogated to (i) Bank of America's purchase money lien against the Allegheny Property to the extent of the debt Mesquite Bank paid to Bank of America–*i.e.*, the sum of $18,000.00, and (ii) the taxing authorities' lien on the Allegheny Property for 2003 real property taxes to the extent of the tax debt paid out of the proceeds of the 2004 Loan–*i.e.*, the sum of $3,699.56.

   a. The doctrine of "[e]quitable subrogation is not dependent upon contract, but arises by operation of law or by implication in equity to prevent injustice." *Harris v. Am. Protection Ins. Co.*, 158 S.W.3d 614, 622 (Tex. App. 2005). The "doctrine allows . . . a party who pays the debt of another to put on the released creditor's shoes and collect reimbursement." *Drilltec Techs., Inc. v. Remp*, 64 S.W.3d 212, 216 (Tex. App. 2001). "As the name implies, subrogation occurs only if it is equitable. Thus, it is used to prevent the unjust enrichment of a debtor whose debt has been paid." *Id.*

   In Texas, "[t]he doctrine of equitable subrogation is given a liberal application and is broad enough to include every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity and good conscience should have been discharged by the latter." *Matagorda County v. Tex. Ass'n of Counties County Govt. Risk Mgmt. Pool*, 975 S.W.2d 782, 785 (Tex. App. 1998). Accordingly, the "two key elements of equitable subrogation are 1) that the party on whose behalf the claimant discharged a debt was primarily liable on the debt, and 2) that the claimant paid the debt involuntarily." *Argonaut Ins. Co. v. Allstate Ins. Co.*, 869 S.W.2d 537, 542 (Tex. App. 1993). The "involuntariness" factor is liberally construed by Texas courts. *Id.* For instance, the

payment by a lender of a pre-existing encumbrance on realty at the request of an owner of property, with an understanding that the payment is to be secured by a first lien on the property, is not a "voluntary" payment. *Langston v. GMAC Mortgage Corp.*, 2005 WL 3436591, at *2 (Tex. App. Dec. 15, 2005) (holding that payoff by a second lender of outstanding encumbrance on home at request of obligor was involuntary and entitled second lender to be equitably subrogated to original lender's lien); *see also Kone v. Harper*, 297 S.W. 294, 297 (Tex. Civ. App. 1927). Additionally, "[i]n applying the equitable subrogation doctrine, [the Texas Supreme Court] has always made it clear that the payment had to be *for the benefit* of the *debtor*–i.e., an *obligor* on the debt–at the time of the 'subrogation' transaction, for the doctrine to apply." *First Nat'l Bank of Kerrville v. O'Dell*, 856 S.W.2d 410, 415 (Tex. 1993).

Here, the Allegheny Property was subject to a valid purchase money lien in favor of Bank of America. Mesquite Bank paid off the outstanding balance of the Bank of America debt in September 2003 when Bank of America was threatening to foreclose on the Allegheny Property. While Mesquite Bank made the payment to protects its second lien position on the Allegheny Property–*i.e.*, the 2003 Lien granted by Frank, and the 2003 Lien has now been held invalid, Lori would receive an inequitable windfall if Mesquite Bank was not permitted to recover these monies from Lori and/or the Allegheny Property. Clearly, the payment of Bank of America's outstanding debt by Mesquite Bank benefitted the Cerveras, who otherwise would have lost the Allegheny Property through Bank of America's foreclosure on that property. Accordingly, this Court finds that Mesquite Bank is equitably subrogated

to Bank of America's prior valid lien to the extent of the funds it paid to Bank of America–*i.e.*, the sum of $18,000.00.

Moreover, the Allegheny Property was subject to a valid lien in favor of the taxing authorities to secure the payment of the 2003 real property taxes. Article 16, § 50(a) of the Texas Constitution provides that "[t]he homestead of a family, or of a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for: . . . (2) the taxes due thereon." Similarly, § 41.001(b)(2) of the Texas Property Code allows liens to be fixed on homestead property for "taxes on the property." The 2003 real property taxes owed on the Allegheny Property were paid from funds advanced by Mesquite Bank under the 2004 Loan. While the 2004 Loan and Lien have been held invalid, Lori would receive an inequitable windfall if Mesquite Bank was not permitted to recover these monies from Lori and/or the Allegheny Property. Clearly, the payment of the 2003 real property taxes on the Allegheny Property benefitted Lori, who was otherwise obligated to pay the taxes. Accordingly, this Court finds that Mesquite Bank is equitably subrogated to the taxing authorities' prior valid lien against the Allegheny Property to the extent of the funds it paid to the taxing authorities–*i.e.*, the sum of $3,699.56.

6. Mesquite Bank sought the recovery of attorneys' fees, expenses, and/or costs as part of its claim for subrogation pursuant to § 38.001 of the Texas Civil Practice and Remedies Code. Generally, under § 38.001, "the party seeking to recover attorney's fees carries the burden of proof." *Smith v. United Nat'l Bank-Denton (In re Smith)*, 966 F.2d 973, 978 (5th Cir. 1992). Accordingly, because Mesquite Bank failed to offer any evidence at trial to

substantiate its claims for attorneys' fees, expenses, and/or costs, it failed to meet its burden and thereby is denied any recovery for attorneys' fees, expenses, and/or costs in connection with this action.

7. Accordingly, the Court concludes that Mesquite Bank is entitled to be subrogated to the prior valid liens against the Allegheny Property to secure repayment of (i) the $18,000.00 Mesquite Bank paid to Bank of America, and (ii) the 2003 real property taxes paid at the closing of the 2004 Loan in the amount of $3,699.56.

A judgment consistent with these findings of fact and conclusions of law will be entered separately.

Signed this 18th day of January, 2006.

_____
**Hon. Barbara J. Houser**
**Chief United States Bankruptcy Judge**